1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  BRIAN A. PROCEL (State Bar No. 218657)
   bprocel@millerbarondess.com
3  CHRISTOPHER D. BEATTY (State Bar No. 266466)
   cbeatty@millerbarondess.com
4  ANDREW L. SCHRADER (State Bar No. 307964)
   aschrader@millerbarondess.com
5  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
6  Los Angeles, California 90067
   Telephone: (310) 552-4400
7  Facsimile: (310) 552-8400

8  Attorneys for Plaintiff
   MICHAEL GOLDBERG AS TRUSTEE OF
9  THE WOODBRIDGE LIQUIDATION
   TRUST

10

11            **UNITED STATES DISTRICT COURT**

12     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

13

| | |
|---|---|
| 14  MICHAEL GOLDBERG AS<br>    TRUSTEE OF THE WOODBRIDGE<br>15  LIQUIDATION TRUST, | **CASE NO. 2:20-cv-9958**<br><br>**COMPLAINT FOR:** |
| 16         Plaintiff, | **1. VIOLATIONS OF SECTION<br>   10(B) OF THE EXCHANGE<br>   ACT AND RULE 10B-5;** |
| 17     v. | |
| 18  ROME McGUIGAN, P.C.; BRIAN<br>    COURTNEY, an individual; BAILEY | **2. AIDING AND ABETTING<br>   FRAUD;** |
| 19  CAVALIERI LLC; THOMAS GEYER,<br>    an individual; IVAN ACEVEDO,<br>20  an individual; and DOES 1-100, inclusive, | **3. AIDING AND ABETTING<br>   BREACH OF FIDUCIARY<br>   DUTY;** |
| 21         Defendants. | **4. NEGLIGENT<br>   MISREPRESENTATION;** |
| 22 | **5. PROFESSIONAL<br>   NEGLIGENCE;** |
| 23 | **6. AIDING AND ABETTING<br>   CONVERSION;** |
| 24 | |
| 25 | **7. ACTUAL FRAUDULENT<br>   TRANSFER; and** |
| 26 | **8. CONSTRUCTIVE<br>   FRAUDULENT TRANSFER** |
| 27 | **JURY TRIAL DEMANDED** |

28

476575.1

---

COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Plaintiff Michael Goldberg in his role as Trustee of the Woodbridge Liquidation Trust ("Plaintiff" or the "Trustee") hereby alleges in his Complaint against Defendants Rome McGuigan, P.C. ("Rome"), Brian Courtney ("Courtney"), Bailey Cavalieri LLC ("Bailey"), Thomas Geyer ("Geyer"), Ivan Acevedo ("Acevedo"), and Doe Defendants 1 through 100 (collectively, "Defendants"), as follows:

## SUMMARY OF THE ACTION

1.      This case arises out of the $1.3 billion Ponzi scheme orchestrated by Robert Shapiro ("Shapiro").  Shapiro's criminal enterprise masqueraded as a real estate investment company known as the Woodbridge Group of Companies ("Woodbridge").  Woodbridge marketed promissory notes and other offerings as low-risk, high yield investments backed by high-interest real-estate loans to third-party commercial borrowers.  To provide additional protection, a substantial percentage of investors were purportedly provided a security interest in real estate owned by an independent third-party borrower.

2.      In fact, there were almost no loans to independent borrowers. Woodbridge instead made sham loans to insider entities that were secretly controlled by Shapiro.  Woodbridge had minimal revenue other than money raised from new investors.  Woodbridge used money raised from new investors to pay false returns to earlier investors.  Shapiro pleaded guilty to fraud and was sentenced to 25 years in federal prison.

3.      Woodbridge did not sell its FPCMs through an exchange, or with registered brokers.  Those deal in registered securities.  Registered securities have numerous requirements under federal and state law, such as regular auditing, that are designed to protect investors from fraud.  For obvious reasons, Woodbridge could not have registered its products as securities.

4.      Woodbridge and its in-house sales team used dozens of financial planners to sell Woodbridge products.  These financial planners were not licensed to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1   sell securities and were concerned that doing so would subject them to liability.

2       5.      To convince wary financial planners to sell Woodbridge products,

3   Defendant Acevedo conceived of a plan to use false and misleading legal opinion

4   memos concluding that Woodbridge products were not securities.  These memos

5   were drafted by Defendants Rome and Bailey.

6       6.      Armed with the memos, Woodbridge went on to take hundreds of

7   millions of dollars in investments.  Because Woodbridge was not following any of

8   the requirements that sellers of securities must follow, it sold the FPCMs to an

9   unsophisticated, largely elderly investor base.  Many of these investors were

10  investing their retirement savings through their IRA accounts.  Woodbridge sold the

11  FPCMs through a network of financial planners who were not registered to sell

12  securities.

13      7.      In late 2017, Woodbridge collapsed when it ran out of new money from

14  investors.  Woodbridge and its affiliated entities filed for bankruptcy starting in

15  December 2017.  The Woodbridge Liquidation Trust was created under a

16  bankruptcy court-approved plan effectuated on February 15, 2019 to assist investors

17  in recovering their catastrophic losses.  Thousands of investors have assigned their

18  claims to the Trust.  Woodbridge targeted retirees and retirement account funds

19  through its fraud.  Many investors lost a substantial portion of their life savings.

20  The Trustee brings these claims on behalf of the defrauded investors.

21      8.      Through this lawsuit,[1] the Trustee seeks in excess of $1 billion from

22

_____

23  [1]  Plaintiff filed an action in Los Angeles Superior Court against Rome, Courtney,
    Bailey, and Geyer, raising some of the claims asserted in this action.  Those
24  defendants filed a motion to quash service, alleging that the court did not have
    personal jurisdiction.  The Court granted those motions, and Plaintiff appealed.
25  Plaintiff brings this action to preserve his rights and ensure that his claims against
    Rome and Bailey are adjudicated on the merits.  Should the state court appeal be
26  successful, resulting in two cases being simultaneously litigated on the merits in two
    forums, he will consider dismissing this action and litigating the case in state court.
27

28

Defendants. In addition, punitive damages are appropriate due to the behavior of Defendants. The investors hereby seek to hold the Defendants responsible for the catastrophic losses they helped cause.

## PARTIES

9. Plaintiff Michael Goldberg is the Trustee of the Woodbridge Liquidation Trust (the "Trust"), a Delaware statutory trust created pursuant to a bankruptcy court-approved plan on February 15, 2019. The Woodbridge Liquidation Trust was formed to pursue, hold and administer the liquidation trust assets and to make distributions to, among others, the victims of the Woodbridge scheme. Goldberg is a Florida resident.

10. Under the terms of the plan, Woodbridge victims had the option to assign any claims they have against third parties who assisted the Woodbridge Ponzi scheme. Plaintiff brings this action as the assignee of those victims who contributed their claims to the Trust.

11. Over 4,600 investors have assigned their claims to the Trust. A schedule of assignments is attached hereto as **Exhibit 1** and incorporated by reference into this Complaint.

12. On information and belief, Defendant Rome McGuigan, P.C. is a Connecticut professional law corporation. On further information and belief, Defendant Brian Courtney at all relevant times has been a partner of Rome and is an individual residing in Connecticut.

13. On information and belief, Defendant Bailey Cavalieri LLC is an Ohio limited liability law company. On further information and belief, Defendant Thomas Geyer at all relevant times has been a partner of Bailey and is an individual residing in Ohio.

14. Defendant Ivan Acevedo is a California resident and former head of sales for Woodbridge. Acevedo was charged with federal felonies along with Shapiro and is awaiting trial.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

15.     Plaintiff is ignorant of the true names, capacities, relationships and extent of participation in the conduct herein alleged of the defendants sued herein as DOES 1 through 100, inclusive, but on information and belief alleges that said defendants are legally responsible to him.  Plaintiff will amend this Complaint to allege the true names and capacities of DOES 1 through 100 when ascertained.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 15 U.S.C. § 78aa(a) because it asserts claims based on violations of the Exchange Act.  This Court also has jurisdiction over this action under 28 U.S.C. § 1331 because it asserts claims arising under federal law.

17.     This Court has jurisdiction under 28 U.S.C. § 1367 over the state-law claims asserted in this action because they form part of the same case or controversy as the claims within the original jurisdiction of this Court.  This Court also has jurisdiction under 28 U.S.C. § 1332 over the state-law claims asserted in this action because there is complete diversity of citizenship between the Trustee and Defendants, and the amount in controversy exceeds $75,000.

18.     Venue is proper in the Central District of California because Woodbridge was headquartered and conducted its sales operations in Sherman Oaks, California, which is in this district.  The Woodbridge Ponzi scheme was a common scheme that was furthered by multiple acts that Defendants committed in this district, including Acevedo directing Woodbridge's sales staff to distribute the false and misleading opinion memos prepared by Rome and Bailey.

19.     Personal jurisdiction for all Defendants is proper under 15 U.S.C. § 78aa because Defendants have sufficient contacts with the United States to satisfy due process.

## FACTUAL ALLEGATIONS

A.     **Woodbridge's Pitch To Prospective Investors**

20.     Woodbridge sold two main types of products, a five-year private

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   placement security ("Fund Offerings" owned by "Unit Holders") and a twelve- to

2   eighteen-month promissory note security called First Position Commercial

3   Mortgages ("FPCMs" or "FPCM Notes" owned by "Note Holders").

4        21.    As to the FPCMs, Woodbridge would issue FPCMs to pools of

5   unrelated, private investors who each contributed at least $25,000.  Many of these

6   pools contained 40 or more investors and constituted millions of dollars of investor

7   funds.

8        22.    Woodbridge told investors that it was making short-term, hard money

9   loans, between $1 million and $100 million, to bona-fide independent third-party

10  property borrowers.  These loans purportedly carried high rates of interest,

11  approximately 11%-15%, secured by a mortgage on the property.  Woodbridge in

12  turn promised Note Holders 5%-8% annual interest paid monthly, along with a

13  return of the Note Holder's principal at the end of the note's term.  Woodbridge also

14  promised Note Holders that their investments were secured with a first position lien

15  on the underlying property to which the loan was made.  Woodbridge explained to

16  investors that they would profit from the spread between the interest on the

17  mortgages and interest owed the Note Holders.

18       23.    Woodbridge's marketing materials described its products as "low risk,"

19  "simpler," "safe" and "conservative," while claiming that investor returns were

20  generated by third-party borrowers' interest payments.  Woodbridge sales agents

21  were given marketing scripts that touted the safety and security of Woodbridge's

22  investments.

23       24.    Woodbridge further represented on its website and in advertising

24  materials that loan-to-value ratios were approximately 60%-70%, ensuring that the

25  Note Holders' funds were significantly over secured.  At the end of the one-year

26  term, the third-party borrowers were purportedly required to repay Woodbridge the

27  principal amount of the loan.  If they defaulted, Woodbridge could foreclose on the

28  property to recover the amount owed.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

25.   Woodbridge's investment materials included the following graphic that summarized the FPCM as follows:



**Now is the time to forego old-fashioned wealth-building solutions.**

Woodbridge Wealth wants to help you diversify your portfolio by participating in the real estate revolution. What does that look like?



**1 Private Lender** You lend money to Woodbridge for 1 year, and receive 5% monthly interest payments.

**2 Woodbridge Wealth** Woodbridge funds the real estate property loan, and receives payments from the owner.

**3 Real Estate Property** The property owner makes payments to Woodbridge and you receive the first lien position as a security.

Let us help you protect your retirement funds from market volatility. We succeed when you succeed. It's that simple.

26.   From August 2012 through December 2017, Woodbridge conducted the Fund Offerings through Funds 1, 2, 3, 3A, and 4 (the "Woodbridge Fund Entities") and Bridge Loan Funds 1 and 2, pursuant to purported registration exemptions under Rules 506(b) and (c) of Regulation D of the federal Securities Act.  The Fund Offerings were, in essence, investments into pooled FPCMs.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

27.     Woodbridge purportedly limited each of the Fund Offerings to accredited investors with a $50,000 minimum subscription and provided for a five-year term with a 6% to 10% aggregate annual return paid monthly and a 2% "accrued preferred dividend."  At the end of the five-year term, Unit Holders would also be entitled to a distribution based on Woodbridge's profits.  Woodbridge represented to investors that their funds would be used to finance real-estate loans.

28.     Woodbridge did not require or evaluate whether prospective Unit Holders were "sophisticated," "accredited" or otherwise had any particular financial acumen.

29.     When Note Holder investments matured, Woodbridge sought to convince Note Holders to move their investments into one of the Fund Offerings or, failing that, to roll their FPCM Note into a new FPCM offering.  When Unit Holder investments matured, Woodbridge sought to convince Unit Holders to roll their investments into a new Fund Offering.  Woodbridge was able to convince approximately 90% of its investors to reenroll at the end of their terms, allowing Woodbridge to avoid having to return their principal.

30.     In total, the Woodbridge Fund Entities raised over $1.3 billion through the sale of FPCM Notes and Fund Offerings as part of the Ponzi scheme.  The amount of funds raised by each of the Woodbridge Fund Entities is as follows:

a)    Fund 1: $197,170,026.46;

b)    Fund 2: $181,182,582.61;

c)    Fund 3: $359,760,916.66;

d)    Fund 3A: $341,029,000;

e)    Fund 4: $258,474,000;

f)    Bridge Loan Fund 1: $5,066,000; and

g)    Bridge Loan Fund 2: $190,000.

**B.     The Reality: Woodbridge Was A Massive Fraud**

31.     Although Woodbridge represented that it made hard-money, high-

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  interest loans to bona-fide independent third-party borrowers, in fact, there were

2  barely any such third-party loans.  In most cases, a Shapiro-controlled entity posing

3  as a third-party borrower would use investor money converted by Shapiro to

4  purchase a property.

5       32.     Then the Shapiro-controlled entity would pose as a third party and

6  purport to enter into a mortgage with one of the Woodridge funds.  That entity

7  would have no source of revenue, or even a bank account, and it would make no

8  payments to Woodbridge.

9       33.     This left Woodbridge with an ever-growing gap between its obligations

10  to make dividend and interest payments to investors, and the small amount of

11  revenue it received from legitimate mortgages.

12       34.     To cover the shortfall, Woodbridge used funds from new investors to

13  make interest and dividend payments to old investors—a classic Ponzi scheme.

14  Nearly everything Woodbridge represented to the public about its FPCM and Fund

15  Holdings was false.

16       35.     In the entire five-year history of the scheme, Woodbridge only had $13

17  million in revenue from actual mortgages to independent third parties—even though

18  the main supposed thrust of Woodbridge's business model was to profit off of high-

19  interest loans made to third-party borrowers.

20       36.     Woodbridge constructed an elaborate artifice, which consisted of

21  hundreds of millions of dollars of mortgages that were entered into, not with third-

22  party borrowers as investors had been told, but with Shapiro-affiliated entities that

23  had no revenues.  Shapiro would purchase luxury properties in the Los Angeles

24  area, Aspen, Colorado, and other locations, using money stored in attorney trust

25  accounts to disguise the fact that Shapiro was the buyer.

26       37.     Woodbridge would create a new entity controlled by Shapiro to

27  purchase the property.  This new entity would have no assets, income, or even bank

28  accounts.  The entity would have a name different from Woodbridge.

38.     Woodbridge would then execute promissory notes and security interests between the new entity and a Woodbridge fund and would record those security interests.  This allowed Woodbridge to falsely represent to the public that it had made a loan to a third party and sell FPCM Notes and Fund Offerings based on that loan.  Woodbridge did not disclose that these "borrowers" were Shapiro-affiliated LLCs.

39.     At all relevant times, the FPCM Notes and Units were securities subject to federal and state securities laws and regulations.  Woodbridge, however, falsely represented to the public that its FPCM Notes were not securities, and embarked on a fraudulent and misleading campaign with certain Defendants to convince investors that FPCM Notes were not securities.

## C.     Acevedo Seeks A Legal Opinion To Assuage Skeptical Brokers

40.     Acevedo, as Director of Investments, helped to build the infrastructure that allowed Woodbridge's fraudulent scheme to operate for years.  Among other things, he operated a boiler room where generating sales at all costs became paramount, and effectively ran much of the day-to-day operation of the scheme.

41.     Acevedo communicated almost daily with Shapiro.  Shapiro set targets for the amount of money Woodbridge needed to raise, whether it would be from FPCM or Fund Offerings, and the time frame in which the money needed to be raised.  To expand the sales of the FPCM Notes and Fund Offerings, Acevedo, in turn, continuously requested properties from Shapiro to market as collateral.

42.     Acevedo was responsible for Woodbridge's entire securities sales operations including oversight of the company's nationwide network of hundreds of external sales agents and direct supervision of Woodbridge's approximately 30 internal sales agents.

43.     The external sales agents were typically financial planners, and were almost invariably not licensed to deal in securities.  Selling securities without a license is unlawful, and the Securities and Exchange Commission aggressively

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

10

1   prosecutes unlicensed sellers of securities.

2       44.    Many financial planners were hesitant to work with Woodbridge

3   because they were concerned that the FPCM Notes were securities and they would

4   incur liability if they sold them.  When Woodbridge's internal sales representatives

5   were asked to brainstorm the top objections they received from potential financial

6   planners, some of them were "this sounds like a security" and "why don't [I] need a

7   license."  Another common objection: "It's too good to be true (Ponzi scheme)."

8       45.    In one instance, a prospective outside salesman called his state

9   regulator asking whether he needed a license to sell Woodbridge products.  This led

10   to an inquiry from the Idaho Department of Finance.

11       46.    To avoid a similar situation happening in the future and to help

12   convince skeptical financial planners that they could legally sell Woodbridge's

13   FPCM Notes, Acevedo, Shapiro, and other members of Woodbridge's management

14   came up with the idea of having a law firm draft an opinion memo stating that the

15   FPCMs were not securities, and thus not subject to federal securities law.

16      **D.**    **Rome Prepares A Misleading Legal Opinion Memorandum And**

17            **Alters Documents To Mislead Investors**

18       47.    Woodbridge set out to find a law firm that would give them an opinion

19   with the desired conclusion.  Woodbridge had trouble finding a law firm that would

20   do the job for the price that Woodbridge was willing to pay.  Shapiro complained to

21   Acevedo that the law firms willing to do the work charged "crazy" prices and "want

22   to put so many disclaimers in it [that] it's worthless."

23       48.    Woodbridge eventually found a law firm that would give an

24   unqualified opinion for the price that Woodbridge was willing to pay: $2,500.  That

25   firm was Defendant Rome.

26       49.    Woodbridge retained Rome to write a legal "opinion" memorandum for

27   Woodbridge that purported to conduct a fair and objective analysis as to whether

28   FPCM Notes are securities under federal law (the "Rome Opinion Memo").  On

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

March 5, 2013, Woodbridge's general counsel, David Golden, emailed Courtney, an attorney at Rome and a longtime friend, to request that he draft an "opinion" memorandum for Woodbridge.

50.     Golden asked Courtney if his firm could draft a "legal opinion that a real estate loan product [that Woodbridge] offer[s] is not a security under Federal law."  Rome was informed that Woodbridge's plan was to use Rome's legal "opinion" memorandum to comfort prospective investors and induce them into purchasing FPCM Notes.

51.     Courtney accepted this request; and on March 14, 2013, Woodbridge executed a retainer agreement with Rome.  The retainer agreement between Woodbridge and Rome provided that Rome was retained "to provide a memorandum opinion letter on the applicability of federal and securities laws to [Woodbridge's] Senior Interest Positions Mortgage Loan Program, and to offer advice on legal issues related to said program."

52.     Notwithstanding the directive it had received from the client, upon researching the matter and the facts of the transactions, Rome realized there was no reasonable basis for the conclusion that FPCM Notes are not securities.  As a result, Rome's first draft of the Rome Opinion Memo did not affirmatively reach the conclusion Woodbridge directed Rome to reach.  Rome noted that it had "struggled" to reach the desired outcome and that the law did not support it.  The draft memorandum also identified facts that weighed against the conclusion that FPCMs were not a security, including that Woodbridge commingled the funds of investors.

53.     Woodbridge was not satisfied with Rome's initial draft opinion memorandum.  On May 30, 2013, Golden emailed Courtney to set up a telephone call to discuss revising the underlying FPCM Note loan documents in order to "get a revised opinion from [Rome] that they are not securities."

54.     Woodbridge then sent Rome the set of documents from the FPCM document package for Rome to "revise as necessary to issue the opinion we

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   discussed."  Courtney revised language in the documents to make FPCM Notes

2   appear less like securities.

3       55.     The changes made by Rome include, among other revisions:

4   (i) changing the title of the "Investment Agreement" to "Loan Agreement";

5   (ii) changing every instance of the word "investment" or "investor" to "loan" or

6   "lender"; and (iii) including representations by the FPCM Note Holder that it has

7   had sufficient access to information to allow it to make its own informed decision.

8       56.     Courtney's changes to the documents were superficial as they were

9   designed to create the appearance to investors that the FPCM Notes were not

10  securities.  Indeed, Courtney's changes did not change the fundamental attributes of

11  FPCM Notes which made them securities; and investors were regularly referred to

12  by Woodbridge as investors, not lenders, both before and after these changes.

13      57.     Courtney circulated the revised set of FPCM documents to Woodbridge

14  on June 3, 2013.  These suggested revisions to the FPCM document package were

15  accepted by Woodbridge.  Woodbridge subsequently used these revised FPCM

16  documents for FPCM transactions with Fund 1, Fund 2, Fund 3 and Fund 3A

17  investors.  Hundreds of millions of dollars were raised with the revised documents.

18      58.     Rome then revised its opinion memorandum to give Woodbridge the

19  conclusion it desired.  Rome took out all language in the memorandum advising

20  readers that courts might consider FPCMs to be securities and that the FPCM Notes

21  bore many features of securities under the applicable legal framework.

22      59.     However, even this revised Rome Opinion Memo was still not as

23  forceful as Woodbridge wanted.  Woodbridge wanted the memorandum to state, in

24  clear and affirmative terms, that Rome had reached the legal conclusion that FPCM

25  Notes are not securities under federal law.  Accordingly, on June 27, 2013, Golden

26  requested that Courtney insert a conclusion heading into the memorandum in bold

27  letters asserting "**the note evidencing the Borrower Loan is not a security under**

28  **the Exchange Act and the Securities Act.**  Thanks."

13

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

60. Per Golden's instructions, Rome added in the requested conclusion heading stating that an FPCM Note "**is not a security under the Exchange Act and the Securities Act.**" Rome also removed from the memorandum factual information that Woodbridge had disclosed to it that would support a finding that the product was a security.

61. For example, Woodbridge disclosed to Rome that investor funds would be commingled. Rome noted this fact in the earlier drafts of the memorandum. But in subsequent drafts Rome took out the references to commingling, even though it had already been informed by Woodbridge that funds were commingled.

62. Moreover, at Shapiro's request, Rome also added to the memorandum that Woodbridge is a licensed broker where required by law, a blatantly false and misleading statement, as Rome knew.

63. Courtney circulated the final version of Rome's "opinion" memorandum on July 30, 2013. The final version does not include any of the initial draft's language advising of the risk that courts might consider FPCM Notes to be securities. This opinion was below the standard of care.

64. On November 6, 2014, Golden reached out to Courtney and asked him to "[p]lease sign [the memo] and send it back to me." Golden wanted Courtney to add a wet signature to the Rome Opinion Memo as a way of providing his endorsement.

65. Per Golden's request, Courtney signed the first page of the Rome Opinion Memo with his initials. This signed version would become the version of the Rome Opinion Memo that Woodbridge would widely share with investors and financial professionals.

E. **Acevedo And Others Use The Rome Memo To Convince Brokers To Sell Woodbridge FPCMs**

66. Throughout the duration of the Ponzi scheme, the signed Rome Opinion Memo that included Courtney's initials was included as part of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  Woodbridge's standard materials shared with prospective financial planners.  The

2  financial planners relied on the Rome memo when they decided to sell FPCM Notes

3  to their clients.

4        67.     Some advisers in turn distributed the Rome memo to Woodbridge's

5  investors.  Woodbridge pitched Sylvan Robin Reeves, an insurance broker and

6  prospective outside salesman, using the Rome memo.  Mr. Reeves subsequently

7  purchased an FPCM for himself.  Mr. Reeves assigned his claim to the Trustee.

8        68.     Although the Rome Opinion Memo was originally drafted in

9  connection with FPCM Notes sold by Fund 1, which alone raised approximately

10  $197,170,026.46, the Rome Opinion Memo was continuously used throughout the

11  course of the Ponzi scheme to induce investors to invest in Woodbridge through

12  2017.  Over this period, the Woodbridge Fund Entities raised hundreds of millions

13  of dollars from investors.

14      **F.**    **Bailey Prepares A False And Misleading Opinion Memorandum**

15        69.     Like Rome, Bailey drafted an "opinion" memo (the "Bailey Opinion

16  Memo") for Woodbridge.  The Bailey Opinion Memo asserted the conclusion that

17  the FPCMs offered by Fund 1 are not securities under Ohio's securities laws.  As

18  with the Rome Opinion Memo, the Bailey Opinion Memo purported to conduct a

19  fair legal analysis of FPCMs.

20        70.     On September 11, 2015, the Ohio Division of Securities served a

21  subpoena duces tecum ad testificandum on Jeff Ahern ("Ahern"), a financial advisor

22  in Ohio who sold FPCM Notes in the state on behalf of Woodbridge.  The subpoena

23  required Ahern to produce documents to the Division and personally appear before

24  the Division to give testimony regarding certain topics described in the subpoena.

25        71.     Woodbridge sought local counsel in Ohio to represent Ahern.  Golden

26  called Thomas Geyer, a partner of Bailey, to request that Bailey represent Ahern in

27  connection with the Ohio Division of Securities subpoena.

28        72.     Geyer agreed to represent Ahern; and on October 21, 2015,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Woodbridge subsequently retained Bailey.  Per the terms of the Bailey engagement letter for representation of Ahern, Bailey would submit bills directly to Woodbridge, and Woodbridge would cover Ahern's legal fees.

73.     To help Geyer prepare for his representation of Ahern, Golden informed Geyer that Woodbridge had opinion memos with analyses that concluded that FPCMs are not securities.

74.     Geyer proceeded to communicate extensively with Golden regarding Ahern's response to the subpoena.  Geyer kept Golden updated on the status of Ahern's document production and on the date of Ahern's deposition.  Geyer also kept Golden apprised of Geyer's conversations and meetings with Ahern.

75.     On October 28, 2015, Geyer circulated his first draft of the Bailey Opinion Memo to Golden.  This first draft included an analysis of whether FPCMs are securities under Ohio securities law and concluded that they are not securities.

76.     The first draft of the Bailey Opinion Memo was addressed to the Ohio Division of Securities and specified that it was being submitted in connection with the subpoena issued to Ahern.

77.     Golden and Woodbridge loved the Bailey Opinion Memo.  Golden responded to Geyer and told him that "[t]he letter to the Division explaining why the Woodbridge Notes are not securities under Ohio law is inspired.  Very impressive.  I love it."

78.     Golden and Woodbridge wanted to use the Bailey Opinion Memo on a more widespread basis.  Like the Rome Opinion Memo, they wanted to disseminate the Bailey Opinion Memo to prospective investors to assuage their concerns over whether FPCMs were securities.  Woodbridge did not want the Bailey Opinion Memo to be limited to the Ahern subpoena.

79.     Accordingly, Golden asked Geyer to create a new version of the Bailey Opinion Memo that could be used on a more widespread basis.  Golden requested of Geyer: "I am also hoping that you'll be able to take out the specifics relating to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  Ahern and send us (Woodbridge) a copy of the securities letter as well.  We'd love
2  to have that for our file."

3      80.    Bailey knew that the reason Woodbridge wanted a more generic, all-
4  purpose version of the memo was because it intended to share it with investors in
5  order to induce them to purchase FPCM Notes.

6      81.    Geyer complied with this request and sent Golden "a Word document
7  that includes the text of the [Bailey Opinion Memo] without the Ahern-specific
8  references."  Geyer sent the Word document as an attachment to an email to Golden.
9  This document included the text of the FPCM analysis under Ohio law, but deleted
10  any references to Ahern or the Ohio Securities Division.

11      82.    Golden was thankful for Geyer's non-Ahern-specific version of the
12  memo.  However, Golden wanted Geyer to make this "all-purpose" version of the
13  memo look more official so that it could be distributed to investors and induce
14  investors to rely upon it as a straightforward opinion memo not tied to a specific
15  state regulator's investigation.  Accordingly, Golden asked Geyer: "could you please
16  take the word document that you provided, and turn it into a pdf letter to us?"

17      83.    Geyer agreed and sent a final PDF version of the Bailey Opinion Memo
18  to Golden on October 30, 2015.  This final PDF version made no mention of the
19  Ohio subpoena or Ahern.

20      84.    This final version of the Bailey Opinion Memo concluded that the
21  Woodbridge FPCM Notes were not securities.  This opinion was below the standard
22  of care.

23      85.    The Bailey Opinion Memo joined the Rome Opinion Memo as one of
24  the standard documents that Woodbridge provided brokers who were concerned
25  about liability for unlawful securities sales.

26      86.    These memos became especially important after Woodbridge was
27  investigated by Massachusetts and Texas securities regulators for selling
28  unregistered securities.  Financial planners who heard about the investigation were

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

very concerned that they would be liable for selling unlicensed securities.  In order to assuage their concerns, Woodbridge regularly provided the Rome and Bailey Opinion Memos to them.  These financial planners went on to sell Woodbridge products to hundreds of investors who assigned their claims to the Trustee.

87.     Some of the financial planners gave the Opinion Memos to their clients, who invested with Woodbridge.  One of those planners presented them to their clients as "unbiased reviews" of the legality of the Woodbridge note program.  Far from being unbiased reviews, the Rome and Bailey Opinion Memos were bought and paid for by Woodbridge with predetermined conclusions.

88.     Although the Bailey Opinion Memo was originally drafted in connection with FPCM Notes sold by Fund 1, which alone raised $197,170,026.46 in investor funds, the Bailey Opinion Memo was continuously used throughout the course of the Ponzi scheme to induce investors to invest in Woodbridge through 2017.  Over this period, the Woodbridge Fund Entities raised hundreds of millions of dollars from investors.

**G.     <u>Woodbridge Collapses</u>**

89.     In late 2017, Woodbridge collapsed.  As federal and state regulators closed in, the press started to publish articles about the scrutiny of Woodbridge.  With the increased negative attention, Woodbridge struggled to raise additional investments.  Woodbridge, like any Ponzi scheme, required ever-increasing amounts of new investments in order to make payments to earlier investors.  In December 2017, Woodbridge ran out of new investor funds and defaulted on its obligations.

90.     On December 4, 2017, the Woodbridge entities began filing for bankruptcy.  A few weeks later, on December 20, 2017, the SEC filed a civil complaint and emergency ex parte motion for injunctive and other relief in federal court alleging that Woodbridge was a massive Ponzi scheme that commingled investor funds, used new investor funds to pay returns to old investors, and spent millions of dollars funding Shapiro's personal lifestyle.  The court immediately

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

granted the emergency motion and entered an asset freeze that same day.

91.     On December 27, 2018, the court entered final judgments against the Woodbridge entities, Shapiro, and other related parties.

92.     In or around October 2019, Shapiro was sentenced to 25 years in prison.

93.     Only after the investors listed on Exhibit 1 contributed their claims to the Trust on February 15, 2019 did they begin to have constructive access to the information and documents that could inform them of potential claims against Defendants.  The role of Defendants in causing the Woodbridge investors' catastrophic losses was unknown until July 2019 or later.  Prior to this time, the facts regarding each Defendant's knowledge and participation in the scheme, as alleged herein, were unavailable to investors and investors had no way of accessing or discovering such facts.

## FIRST CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Rome, Courtney, and DOES 1-100)

94.     Plaintiff repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

95.     In the seminal case *Central Bank of Denver*, the Supreme Court held that the Securities Exchange Act does not recognize a cause of action for aiding and abetting securities fraud.  *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994).  However, as the Supreme Court noted, direct (i.e., not aiding and abetting) liability attaches to the maker of false statements; this can include any number of people other than the issuer.  *Id.*  ("The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1 purchaser or seller of securities relies may be liable as a primary violator under 10b-
2 5, assuming *all* of the requirements for primary liability under Rule 10b-5 are
3 met.").

4      96.    Several reported court of appeals decisions explore how lawyers can
5 commit a primary violation. In *Ackerman*, the defendant was an attorney who
6 drafted an opinion letter claiming that a security would entitle its investors to
7 various tax credits if they purchased the security. *Ackerman v. Schwartz*, 947 F.2d
8 841 (7th Cir. 1991). The tax credits did not materialize, the promoters spent all of
9 the money, and the scheme collapsed. *Id.* at 842-43. The lawyer's opinion letter
10 recited false facts about the venture to make the scheme seem legitimate. *Id.* at 843.
11 The trial court granted a defense motion for summary judgment on a 10b-5 claim,
12 reasoning that plaintiffs were essentially alleging an aiding and abetting theory. *Id.*
13 at 845-46. The court of appeals reversed because the trial court had not considered
14 that the lawyer had authorized his letter to be distributed to investors'
15 representatives. *Id.* at 848.

16      97.    In *Kline*, a lawyer was once again providing an opinion about the tax
17 consequences of an investment. *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480 (3rd
18 Cir. 1994). The lawyer drafted three opinion letters, and each included a disclaimer
19 that the letter was for the sole use of the issuer and was not intended to be relied on
20 by others. *Id.* at 482-83. Despite that disclaimer, the record showed that the lawyer
21 was aware that the letters were being distributed to prospective investors, and the
22 court of appeal found that the trial court correctly denied summary judgment on the
23 10b-5 claim against the lawyer. *Id.* at 483-86.

24      98.    By drafting the Rome Opinion Memo and allowing it to be distributed
25 to financial planners and other prospective sellers of Woodbridge products, Rome
26 and Courtney made false statements or omissions by the use of any means or
27 instrumentality of interstate commerce in connection with the sale of securities.

28      99.    The Rome Opinion Memo contained materially false or misleading

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

statements, including:

a) The statement that "it is readily apparent under the *Reves* test that the Note evidencing a Borrower Loan is not a security under the Securities Act or the Exchange Act" was false because Rome and Courtney did not hold this opinion. It was not "readily apparent" that the FPCM Notes were not securities; in fact, the opposite is true. Rome and Courtney did not honestly hold the opinion that it was "readily apparent" that the FPCM Notes were not securities. This is shown by the earlier drafts of the Rome Opinion Memo, which concluded that "As currently constituted, however, the Woodbridge Loan may meet the requirements of the second and third *Reves* factors. A court, when weighing all the factors, as a whole, might weigh more heavily the second and third factors and conclude that the note is a security. It is a close case."

b) Rome and Courtney's statement that "it is readily apparent under the *Reves* test that the Note evidencing a Borrower Loan is not a security under the Securities Act or the Exchange Act" was also misleading because Rome and Courtney failed to disclose the facts which undermined the conclusion in the memo. One of the factors that Rome analyzed was whether Woodbridge was raising money for the "general use of a business enterprise," which tends to indicate that the instrument is a security. In the Rome Opinion Memo, Rome and Courtney did not disclose that funds from investors were commingled with Woodbridge's general operating funds, a fact which cut against the opinion in the Rome Opinion Memo. Rome and Courtney were aware of this fact because they included it in an earlier draft of the Rome Opinion Memo.

c) Rome and Courtney's description of the structure of the Woodbridge

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

FPCM, namely that Woodbridge's business model was making loans to commercial borrowers secured by commercial properties, was false. In fact, Woodbridge was a Ponzi scheme, there were almost no commercial borrowers, and Woodbridge used the funds invested by new investors to make interest payments to previous investors. Rome and Courtney were at least reckless for making this statement. Based on the information that Woodbridge provided Rome and Courtney, they knew that Woodbridge was promising high, consistent investment returns with little or no risk. They also knew that Woodbridge was selling unregistered investments through sellers that were not licensed to deal in securities. All of these things are "red flags" that an investment is a Ponzi scheme. By ignoring these red flags and not doing further due diligence on Woodbridge, Rome and Courtney acted highly unreasonably that was an extreme departure from the standards of ordinary care. This danger was either known to Rome and Courtney or was so obvious that they must have been aware of it.

100.  Rome was informed that Woodbridge's plan was to use Rome's legal "opinion" memorandum to comfort others, including prospective investors, and induce the purchase of FPCM Notes. Rome knew of this plan because it was given a predetermined legal opinion to reach. It was also asked to include a conclusion in bold lettering that would be easy for a layperson to read.

101.  Woodbridge distributed the Rome Opinion Memo to financial planners and other prospective outside sales people who were not licensed to sell securities. Woodbridge also distributed it to prospective investors who assigned their claims to Plaintiff. For example, Sylvan Robin Reeves was sent the Rome Opinion Memo prior to making his investment in Woodbridge and relied on its contents in making the decision to invest. Subsequently, he assigned his claim to Plaintiff.

102.  Those prospective investors, financial planners and other outside sales

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   people who were not licensed to sell securities relied on the conclusion in the Rome

2   Opinion Memo that the FPCM Notes were not securities.  Had they known that the

3   FPCM Notes were in fact unregistered securities, they would not have bought or

4   sold them.

5       103.   These financial planners in turn sold the FPCM Notes to Woodbridge's

6   investors.  The investors suffered damage because they paid artificially inflated

7   prices for the FPCM Notes.  Had they known that the FPCM Notes were being sold

8   as part of a massive and unlawful unregistered securities scheme, they would have

9   not purchased them at the price they paid, if at all.  As a result, damages in excess of

10  $500 million have been incurred.

11                      **SECOND CAUSE OF ACTION**

12  **Aiding and Abetting Securities Fraud, California Corp. Code §§ 25401, 25504.1**

13                              *et seq.*

14              **(Against Rome, Courtney, and DOES 1-100)**

15      104.   Plaintiff repeats and realleges each and every foregoing and subsequent

16  allegation contained in the Complaint, and further alleges as follows:

17      105.   As set forth above, Woodbridge offered to sell securities in the State of

18  California by means of numerous written and oral communications including untrue

19  statements of material fact or omitting to state material facts necessary to make the

20  statements made, in light of the circumstances under which the statements were

21  made, not misleading.  Among other materially false and misleading statements,

22  Woodbridge (i) misrepresented that the FPCM investments were not securities;

23  (ii) falsely stated that investor funds would be used to make mortgage loans to third

24  parties, when in fact they were misappropriated by Shapiro, used by Shapiro to pay

25  Woodbridge's operating costs, and paid as false "profits" to earlier investors as part

26  of a massive Ponzi scheme; (iii) issued offering documents that falsely characterized

27  the regulatory proceedings against Woodbridge while concealing several regulatory

28  proceedings altogether; and (iv) incorrectly stated that its offerings would be sold by

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   licensed broker-dealers, when in fact they were primarily sold by unlicensed ones.

2       106.   Courtney and Rome materially assisted in Woodbridge's actions to sell

3   securities using written or oral communications that included numerous untrue

4   statements of material fact, and numerous omissions of material fact that were

5   necessary to make other statements, in light of the circumstances under which the

6   statements were made, not misleading.  Courtney and Rome drafted the Rome

7   Opinion Memo, revised the package of FPCM documents that was provided to

8   investors, and revised the Investment Agreement.  Each of these documents that

9   Courtney and Rome drafted and revised contained numerous statements of material

10  fact that they knew were false or misleading and knew would be distributed to the

11  investors in connection with Woodbridge's sale of securities.  These false and

12  misleading statements include, but are not limited, to:

13      a)   Asserting in the Rome Opinion Memo that FPCM Notes are not

14           securities under federal law.  Courtney and Rome knew that this was a

15           false and unreasonable conclusion when they drafted the memo;

16      b)   Concealing certain material facts in the Rome Opinion Memo that

17           weigh in favor of FPCM Notes being securities, such as the fact that

18           investor funds were commingled;

19      c)   Revising and preparing new versions of FPCM documents, including

20           the promissory note, collateral assignment, and inter-creditor

21           agreements, that were provided to investors in the ordinary course.

22           Rome made certain revisions that would create the façade and mislead

23           investors and regulators to believe that the FPCM Notes are not

24           securities; however, Rome knew that these changes did not change the

25           fundamental traits of FPCM Notes that make them securities; and

26      d)   Revising and preparing a new Investment Agreement by dubbing it a

27           "Loan Agreement" to create the appearance that the FPCM Note is not

28           a security.  Rome, however, knew that this change would not render the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    FPCM Note a security under federal law, and understood that there was

2    still a substantial risk that FPCM Notes would be considered securities

3    by courts and regulators.

4    107.   By drafting the Rome Opinion Memo and revising and updating the

5    FPCM documents and Investment Agreement, Courtney and Rome played a

6    material, facilitating role in Woodbridge's sale of securities by means of

7    misrepresentations or omissions of material fact.  Because of Courtney's and

8    Rome's material assistance, they are jointly and severally liable with Woodbridge

9    under California law.

10   108.   Because Courtney and Rome are jointly and severally liable with

11   Woodbridge based upon their knowing and material assistance of Woodbridge's

12   securities violations, they are jointly and severally liable for rescission of the

13   investors' purchases of securities in an amount to be determined at trial, but believed

14   to be in excess of $500 million.

## THIRD CAUSE OF ACTION

### Aiding and Abetting Fraud

### (Against Rome, Courtney, and DOES 1-100)

18   109.   Plaintiff repeats and realleges each and every foregoing and subsequent

19   allegation contained in the Complaint, and further alleges as follows:

20   110.   Woodbridge made materially false and misleading statements to

21   investors in PPMs, FPCM documents, and the new product offering documents and

22   New Product Disclosures, including, but not limited to:

23   a)   Concealing that Woodbridge was paying millions of dollars in

24        commissions to unregistered agents;

25   b)   Misrepresenting that Woodbridge's business model was making loans

26        to third parties when in fact it was predominately making loans to

27        Shapiro-affiliated and controlled entities;

28   c)   Misrepresenting the findings of state regulatory investigations against

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Woodbridge; and

    d)    Concealing ongoing regulatory investigations.

111.   Woodbridge was obligated to disclose the true facts to investors because the failure to disclose them rendered the Fund PPMs, the FPCM offering documents, the "new product" offering documents and New Product Disclosure, and subsequent disclosure updates to those documents materially misleading.

112.   The investors did not know the true facts.

113.   Woodbridge intended to deceive investors into investing in Woodbridge by concealing or misrepresenting the true facts.

114.   Had the investors known the concealed or true facts, they would not have purchased securities from Woodbridge. Woodbridge's concealment and misstatements were a substantial factor in causing the investors' harm.

115.   Courtney and Rome provided substantial assistance to Shapiro and Woodbridge by drafting the Rome Opinion Memo, revising the package of FPCM documents that was provided to investors, and revising the Investment Agreement. Each of these documents that Courtney and Rome drafted and revised contained numerous statements and concealments of material fact that they knew were false or misleading and knew would be distributed to the investors in connection with Woodbridge's sale of securities. These false and misleading statements and concealments include, but are not limited to:

    a)    Asserting in the Rome Opinion Memo that FPCM Notes are not securities under federal law. Courtney and Rome knew that this was a false and unreasonable conclusion when they drafted the memo;

    b)    Concealing certain material facts in the Rome Opinion Memo that weigh in favor of FPCM Notes being securities, such as the fact that investor funds were commingled;

    c)    Revising and preparing new versions of FPCM documents, including the promissory note, collateral assignment, and inter-creditor

agreements, that were provided to investors in the ordinary course. Rome made certain revisions that would create the façade and mislead investors and regulators to believe that the FPCM Notes are not securities; however, Rome knew that these changes did not change the fundamental traits of FPCM Notes that make them securities; and

d)      Revising and preparing a new Investment Agreement by dubbing it a "Loan Agreement" to create the appearance that the FPCM Note is not a security.  Rome, however, knew that this change would not render the FPCM Note a security under federal law, and understood that there was still a substantial risk that FPCM Notes would be considered securities by courts and regulators.

116.   Courtney and Rome knew that Woodbridge was going to use the Rome Opinion Memo, the revised FPCM documents, and the revised Investment Agreement to induce investors to purchase Woodbridge's securities.

117.   Courtney's and Rome's conduct was a substantial factor in causing harm to the investors.

118.   The investors were harmed by the fraudulent conduct of Woodbridge that Courtney and Rome knowingly and substantially assisted.  As a direct and proximate result of such conduct, the investors have suffered damages in an amount to be proven at trial but believed to be in excess of $500 million.

119.   Courtney's and Rome's actions were undertaken intentionally and in conscious disregard of Plaintiff's rights.  In addition, these acts were malicious, oppressive, and fraudulent.  Plaintiff should be awarded punitive damages sufficient to punish Courtney and Rome and to deter similar conduct in the future.

## FOURTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Rome, Courtney, and DOES 1-100)

120.   Plaintiff repeats and realleges each and every foregoing and subsequent

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

allegation contained in the Complaint, and further alleges as follows:

121.   At all relevant times, Shapiro was the sole individual controlling the Woodbridge entities and all of their funds.  Shapiro had complete control, and was the sole signatory, of all Woodbridge bank accounts.  By reason of his controlling positions, actions, and representations to the investors, and by reason of the investors having deposited funds into Shapiro's control with the understanding he would act in accordance with his promises in regard to the use of such funds, Shapiro owed investors fiduciary duties of loyalty and care and to deal honestly and in good faith.

122.   By selling the investors FPCM Notes and Unit Offerings pursuant to false offering materials and false FPCM documents; misappropriating, commingling, and otherwise misusing investor funds; and operating Woodbridge as a massive Ponzi scheme, Shapiro breached fiduciary duties owed to the investors.

123.   Courtney and Rome substantially assisted Shapiro's breach of his fiduciary duties by drafting the Rome Opinion Memo, revising the package of FPCM documents that was provided to investors, and revising the Investment Agreement.  Each of these documents that Courtney and Rome drafted and revised contained numerous statements and concealments of material fact that they knew were false or misleading and knew would be distributed to the investors in connection with Woodbridge's sale of securities.  These false and misleading statements and concealments include, but are not limited to:

a)   Asserting in the Rome Opinion Memo that FPCM Notes are not securities under federal law.  Courtney and Rome knew that this was a false and unreasonable conclusion when they drafted the memo;

b)   Concealing certain material facts in the Rome Opinion Memo that weigh in favor of FPCM Notes being securities, such as the fact that investor funds were commingled;

c)   Revising and preparing new versions of FPCM documents, including

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

the promissory note, collateral assignment, and inter-creditor agreements, that were provided to investors in the ordinary course. Rome made certain revisions that would create the façade and mislead investors and regulators to believe that the FPCM Notes are not securities; however, Rome knew that these changes did not change the fundamental traits of FPCM Notes that make them securities; and

d)   Revising and preparing a new Investment Agreement by dubbing it a "Loan Agreement" to create the appearance that the FPCM Note is not a security.  Rome, however, knew that this change would not render the FPCM Note a security under federal law, and understood that there was still a substantial risk that FPCM Notes would be considered securities by courts and regulators.

124.   Courtney and Rome knew that Shapiro was breaching his fiduciary duties to the investors by knowingly selling them unregistered securities in the form of FPCM Notes, and by inducing them to invest through false and unreasonable assurances that FPCMs are not securities.

125.   As a result of Shapiro's breaches of his fiduciary duties to the investors that Courtney and Rome knowingly and substantially assisted, the investors were harmed in an amount to be determined at trial but believed to be in excess of $500 million.

126.   Courtney's and Rome's actions were undertaken intentionally and in conscious disregard of Plaintiff's rights.  In addition, these acts were malicious, oppressive, and fraudulent.  Plaintiff should be awarded punitive damages sufficient to punish Courtney and Rome and to deter similar conduct in the future.

## FIFTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against Rome, Courtney, and DOES 1-100)

127.   Plaintiff repeats and realleges each and every foregoing and subsequent

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

allegation contained in the Complaint, and further alleges as follows:

128.  Courtney and Rome substantially assisted the Woodbridge Ponzi scheme by drafting the Rome Opinion Memo, revising the package of FPCM documents that was provided to investors, and revising the Investment Agreement. Each of these documents that Courtney and Rome drafted and revised contained numerous statements and concealments of material fact that they either knew were false or misleading or had no reasonable grounds for believing were true or accurate when they made them.  These false and misleading statements and concealments include, but are not limited, to:

a)  Asserting in the Rome Opinion Memo that FPCM Notes are not securities under federal law.  Courtney and Rome knew that this was a false and unreasonable conclusion when they drafted the memo;

b)  Concealing certain material facts in the Rome Opinion Memo that weigh in favor of FPCM Notes being securities, such as the fact that investor funds were commingled;

c)  Revising and preparing new versions of FPCM documents, including the promissory note, collateral assignment, and inter-creditor agreements, that were provided to investors in the ordinary course. Rome made certain revisions that would create the façade and mislead investors and regulators to believe that the FPCM Notes are not securities; however, Rome knew that these changes did not change the fundamental traits of FPCM Notes that make them securities; and

d)  Revising and preparing a new Investment Agreement by dubbing it a "Loan Agreement" to create the appearance that the FPCM Note is not a security.  Rome, however, knew that this change would not render the FPCM Note a security under federal law, and understood that there was still a substantial risk that FPCM Notes would be considered securities by courts and regulators.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

129.   Because Courtney and Rome knew that the Rome Opinion Memo and their revised FPCM document package and Investment Agreement would be circulated to and relied upon by investors, they owed the investors a duty of care to make sure that their representations were true, reasonable, and not misleading.

130.   Courtney's and Rome's conduct in drafting the Rome Opinion Memo and the revised FPCM document package and Investment Agreement fell below the applicable standard of care, as they failed to use the skill and care that a reasonably careful attorney would have used under similar circumstances.

131.   Investors reasonably relied on the false representations and assurances in the Rome Opinion Memo, revised FPCM documents, and revised Investment Agreement that Courtney and Rome drafted when the investors purchased their investments in Woodbridge.  Had they known the true facts, they would have not purchased the securities.

132.   Courtney's and Rome's negligent conduct was a substantial factor in causing the investors' harm.

133.   As a direct and proximate result of Courtney's and Rome's negligent conduct described above, the investors were harmed in an amount to be determined at trial, but believed to be in excess of $500 million.

## SIXTH CAUSE OF ACTION

### Professional Negligence

### (Against Rome, Courtney, and DOES 1-100)

134.   Plaintiff repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

135.   Courtney and Rome substantially assisted the Woodbridge Ponzi scheme by drafting the Rome Opinion Memo, revising the package of FPCM documents that was provided to investors, and revising the Investment Agreement. Each of these documents that Courtney and Rome drafted and revised contained numerous statements and concealments of material fact that they either knew were

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

false or misleading or had no reasonable grounds for believing were true or accurate when they made them.  These false and misleading statements and concealments include, but are not limited, to:

a)   Asserting in the Rome Opinion Memo that FPCM Notes are not securities under federal law.  Courtney and Rome knew that this was a false and unreasonable conclusion when they drafted the memo;

b)   Concealing certain material facts in the Rome Opinion Memo that weigh in favor of FPCM Notes being securities, such as the fact that investor funds were commingled;

c)   Revising and preparing new versions of FPCM documents, including the promissory note, collateral assignment, and inter-creditor agreements, that were provided to investors in the ordinary course. Rome made certain revisions that would create the façade and mislead investors and regulators to believe that the FPCM Notes are not securities; however, Rome knew that these changes did not change the fundamental traits of FPCM Notes that make them securities; and

d)   Revising and preparing a new Investment Agreement by dubbing it a "Loan Agreement" to create the appearance that the FPCM Note is not a security.  Rome, however, knew that this change would not render the FPCM Note a security under federal law, and understood that there was still a substantial risk that FPCM Notes would be considered securities by courts and regulators.

136.   Because Courtney and Rome knew that the Rome Opinion Memo and their revised FPCM document package and Investment Agreement would be circulated to and relied upon by investors, they owed the investors a duty of care to make sure that their representations were true, reasonable, and not misleading.

137.   Courtney's and Rome's conduct in drafting the Rome Opinion Memo and the revised FPCM document package and Investment Agreement fell below the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

applicable standard of care, as they failed to use the skill and care that a reasonably careful attorney would have used under similar circumstances.

138.   Investors reasonably relied on the false representations and assurances in the Rome Opinion Memo, revised FPCM documents, and revised Investment Agreement that Courtney and Rome drafted when the investors purchased their investments in Woodbridge.  Had they known the true facts, they would have not purchased the securities.

139.   Courtney's and Rome's negligent conduct was a substantial factor in causing the investors' harm.

140.   As a direct and proximate result of Courtney's and Rome's negligent conduct described above, the investors were harmed in an amount to be determined at trial, but believed to be in excess of $500 million.

## SEVENTH CAUSE OF ACTION

### Aiding and Abetting Conversion

### (Against Rome, Courtney, and DOES 1-100)

141.   Plaintiff repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

142.   Each investor provided an identifiable sum of money to Woodbridge.

143.   At all relevant times, these investors had a right to immediate possession of their property transferred to Woodbridge.

144.   At all relevant times, Shapiro was the sole individual controlling the Woodbridge entities and all of their funds.  Shapiro had complete control, and was the sole signatory, of all Woodbridge bank accounts.

145.   Exercising such control and using his access to the property that the investors placed with Woodbridge, Shapiro interfered with the investors' right to immediate possession of their property by, among other things, misappropriating, commingling, and otherwise misusing investor money for various improper and illegal purposes.  As part of the Ponzi scheme, Shapiro converted investors' funds

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

provided to Woodbridge by, among other things:

  a) Funneling the investors' money into LLCs that were affiliated with and controlled by Shapiro, thereby allowing Shapiro to "pocket" their money with entities that he controlled;

  b) Using their money to pay Woodbridge's operating costs;

  c) Using their money to pay false "profits" and "interest" payments to earlier investors;

  d) Misappropriating their money to sustain Shapiro's lavish personal lifestyle, including using their funds to pay for his mansion and home renovations, travel and charter planes, and luxury items such as exotic cars, expensive and rare artwork, a personal wine collection, and jewelry; and

  e) Misappropriating their money to pay Shapiro's personal income taxes.

146.  Shapiro's and Woodbridge's interference with the investors' right to possession was knowing and intentional.

147.  Courtney and Rome substantially assisted Shapiro's conversion by drafting the Rome Opinion Memo, revising the package of FPCM documents that was provided to investors, and revising the Investment Agreement. Each of these documents that Courtney and Rome drafted and revised contained numerous statements and concealments of material fact that they knew were false or misleading and knew would be distributed to the investors in connection with Woodbridge's sale of securities. These false and misleading statements and concealments include, but are not limited to:

  a) Asserting in the Rome Opinion Memo that FPCM Notes are not securities under federal law. Courtney and Rome knew that this was a false and unreasonable conclusion when they drafted the memo;

  b) Concealing certain material facts in the Rome Opinion Memo that weigh in favor of FPCM Notes being securities, such as the fact that

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    investor funds were commingled;

2    c)    Revising and preparing new versions of FPCM documents, including

3          the promissory note, collateral assignment, and inter-creditor

4          agreements, that were provided to investors in the ordinary course.

5          Rome made certain revisions that would create the façade and mislead

6          investors and regulators to believe that the FPCM Notes are not

7          securities; however, Rome knew that these changes did not change the

8          fundamental traits of FPCM Notes that make them securities; and

9    d)    Revising and preparing a new Investment Agreement by dubbing it a

10         "Loan Agreement" to create the appearance that the FPCM Note is not

11         a security.  Rome, however, knew that this change would not render the

12         FPCM Note a security under federal law, and understood that there was

13         still a substantial risk that FPCM Notes would be considered securities

14         by courts and regulators.

15   148.   Courtney and Rome knew that Shapiro was converting the investors'

16   property, as they were aware of the fact that Shapiro improperly commingled the

17   investors' funds.

18   149.   As a proximate result of Woodbridge's conversion of their property

19   that Courtney and Rome knowingly and substantially assisted, the investors have

20   been harmed in an amount to be determined at trial, but believed to be in excess of

21   $500 million.

22   150.   Courtney's and Rome's actions were undertaken intentionally and in

23   conscious disregard of the investors' rights.  In addition, these acts were malicious,

24   oppressive, and fraudulent.  Plaintiff should be awarded punitive damages sufficient

25   to punish Courtney and Rome and to deter similar conduct in the future.

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**EIGHTH CAUSE OF ACTION**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against Bailey, Geyer, and DOES 1-100)**

151.   Plaintiff repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

152.   In the seminal case *Central Bank of Denver*, the Supreme Court held that the Securities Exchange Act does not recognize a cause of action for aiding and abetting securities fraud. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994). However, as the Supreme Court noted, direct (i.e., not aiding and abetting) liability attaches to the maker of false statements; this can include any number of people other than the issuer. *Id.* ("The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met.").

153.   Several reported court of appeals decisions explore how lawyers can commit a primary violation. In *Ackerman*, the defendant was an attorney who drafted an opinion letter claiming that a security would entitle its investors to various tax credits if they purchased the security. *Ackerman v. Schwartz*, 947 F.2d 841 (7th Cir. 1991). The tax credits did not materialize, the promoters spent all of the money, and the scheme collapsed. *Id.* at 842-43. The lawyer's opinion letter recited false facts about the venture to make the scheme seem legitimate. *Id.* at 843. The trial court granted a defense motion for summary judgment on a 10b-5 claim, reasoning that plaintiffs were essentially alleging an aiding and abetting theory. *Id.* at 845-46. The court of appeals reversed because the trial court had not considered

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    that the lawyer had authorized his letter to be distributed to investors'

2    representatives.  *Id.* at 848.

3        154.   In *Kline*, a lawyer was once again providing an opinion about the tax

4    consequences of an investment.  *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480 (3rd

5    Cir. 1994).  The lawyer drafted three opinion letters, and each included a disclaimer

6    that the letter was for the sole use of the issuer and was not intended to be relied on

7    by others.  *Id.* at 482-83.  Despite that disclaimer, the record showed that the lawyer

8    was aware that the letters were being distributed to prospective investors, and the

9    court of appeal found that the trial court correctly denied summary judgment on the

10   10b-5 claim against the lawyer.  *Id.* at 483-86.

11       155.   By drafting the Rome Opinion Memo and allowing it to be distributed

12   to financial planners and other prospective sellers of Woodbridge products, Rome

13   and Courtney made false statements or omissions by the use of any means or

14   instrumentality of interstate commerce in connection with the sale of securities

15       156.   In the Bailey Opinion Memo, Bailey and Geyer made the following

16   false statements:

17       a)      Bailey and Geyer stated that "Woodbridge primarily offers short-term

18               financing to commercial borrowers, secured by commercial properties

19               such as apartment and mixed-use buildings, and single family homes

20               owned as investment properties ('Borrower Loans')."  This statement

21               was false.  In the vast majority of cases, there were no commercial

22               borrowers, and the mortgages were between Woodbridge and a

23               Shapiro-controlled entity.  Bailey and Geyer were aware of the truth, or

24               they were reckless to the truth or falsity of the statement.  In the sample

25               documents that Bailey and Geyer reviewed, the Woodbridge fund, the

26               borrowing entity on the underlying mortgage, and the entity owning the

27               underlying real property are all listed as having the same place of

28               business: Woodbridge's office in Sherman Oaks, California.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

b)       Bailey and Geyer also stated that "When making a Woodbridge Note, Woodbridge does not provide any information about Woodbridge itself or its financial condition or results of operation.  Therefore no Lender can be viewed as making an investment decision about Woodbridge; instead the Lender is making a loan memorialized by a Woodbridge Note."  The first statement was true; Woodbridge did not provide information about its financial condition to investors.  However, the second statement is false.  Because the loans were made by one Woodbridge entity to another Woodbridge entity, investors had to be making an investment decision based on Woodbridge's financial condition.  Bailey and Geyer were aware of this because the sample documents they relied on showed that all of the entities were Woodbridge affiliates.

c)       Bailey and Geyer also stated that "[t]he economic substance of a Woodbridge Note is its secured collateral, which is the Borrower Loan and the first position lien on the commercial property underlying the Borrower Loan."  This statement was false.  The documents that Bailey and Geyer were provided indicated that the Woodbridge investor did not have any security interest in the property itself.  Those documents showed that the note was purportedly secured by an equity interest in the Woodbridge entity that owned the property.

157.   Woodbridge distributed the Bailey Opinion Memo to financial planners and other prospective outside sales people who were not licensed to sell securities.

158.   Those financial planners and other outside sales people who were not licensed to sell securities relied on the conclusion in the Bailey Opinion Memo that the FPCM Notes were not securities.  Had they known that the facts recited to support the conclusion in the memo were false, they would not have accepted its conclusion that the FPCM Notes were not securities, and thus not sold them.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

159.   These financial planners in turn sold the FPCM Notes to Woodbridge's investors.  The investors suffered damage because they paid artificially inflated prices for the FPCM Notes.  Had the investors known that the FPCM Notes were being sold as part of a massive and unlawful unregistered securities scheme, they would have not purchased them at the price they paid, if at all.

## **NINTH CAUSE OF ACTION**

**Aiding and Abetting Securities Fraud, California Corp. Code §§ 25401, 25504.1**

*et seq.*

**(Against Bailey, Geyer, and DOES 1-100)**

160.   Plaintiff repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

161.   As set forth above, Woodbridge offered to sell securities in the State of California by means of numerous written and oral communications including untrue statements of material fact or omitting to state material facts necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.  Among other materially false and misleading statements, Woodbridge (i) misrepresented that the FPCM investments were not securities; (ii) falsely stated that investor funds would be used to make mortgage loans to third parties, when in fact they were misappropriated by Shapiro, used by Shapiro to pay Woodbridge's operating costs, and paid as false "profits" to earlier investors as part of a massive Ponzi scheme; (iii) issued offering documents that falsely characterized the regulatory proceedings against Woodbridge while concealing several regulatory proceedings altogether; and (iv) incorrectly stated that its offerings would be sold by licensed broker-dealers, when in fact they were primarily sold by unlicensed ones.

162.   Geyer and Bailey materially assisted in Woodbridge's actions to sell securities using written or oral communications that included numerous untrue statements of material fact, and numerous omissions of material fact that were necessary to make other statements, in light of the circumstances under which the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

statements were made, not misleading.  Geyer and Bailey drafted the Bailey Opinion Memo, which asserted the false and unreasonable conclusion that FPCM Notes are not securities under Ohio law.

163.   Geyer and Bailey knew that the Bailey Opinion Memo was false and misleading and knew that Woodbridge planned to distribute the Bailey Opinion Memo to the investors in connection with Woodbridge's sale of securities.  Indeed, when Woodbridge requested that Geyer and Bailey prepare an "all purpose" version of the memo that could be distributed on a widespread basis, Geyer readily complied and quickly sent a version of the Bailey Opinion Memo that would accommodate Woodbridge's request.

164.   By drafting the Bailey Opinion Memo, Geyer and Bailey played a material, facilitating role in Woodbridge's sale of securities by means of misrepresentations or omissions of material fact.  Because of Geyer's and Bailey's material assistance, they are jointly and severally liable with Woodbridge under California law.

165.   Because Geyer and Bailey are jointly and severally liable with Woodbridge based upon their knowing and material assistance of Woodbridge's securities violations, they are jointly and severally liable for rescission of the investors' purchases of securities in an amount to be determined at trial, but believed to be in excess of $500 million.

### TENTH CAUSE OF ACTION

### Aiding and Abetting Fraud

### (Against Bailey, Geyer, and DOES 1-100)

166.   Plaintiff repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

167.   Woodbridge made materially false and misleading statements to investors in PPMs, FPCM documents, and the new product offering documents and New Product Disclosure, including, but not limited to:

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

a)   Concealing that Woodbridge was paying millions of dollars in commissions to unregistered agents;

b)   Misrepresenting that Woodbridge's business model was making loans to third parties when in fact it was predominately making loans to Shapiro-affiliated and controlled entities;

c)   Misrepresenting the findings of state regulatory investigations against Woodbridge; and

d)   Concealing ongoing regulatory investigations.

168.   Woodbridge was obligated to disclose the true facts to investors because the failure to disclose them rendered the Fund PPMs, the FPCM offering documents, the "new product" offering documents and New Product Disclosure, and subsequent disclosure updates to those documents materially misleading.

169.   The investors did not know the true facts.

170.   Woodbridge intended to deceive investors into investing in Woodbridge by concealing or misrepresenting the true facts.

171.   Had the investors known the concealed or true facts, they would not have purchased securities from Woodbridge.  Woodbridge's concealment and misstatements were a substantial factor in causing the investors' harm.

172.   Geyer and Bailey provided substantial assistance to Woodbridge by drafting the Bailey Opinion Memo, which asserted the false and unreasonable conclusion that FPCM Notes are not securities under Ohio law.

173.   Geyer and Bailey knew that the Bailey Opinion Memo was false and misleading and that Woodbridge planned to distribute the Bailey Opinion Memo to the investors to induce them to purchase Woodbridge's securities.  Indeed, when Woodbridge requested that Geyer and Bailey prepare an "all purpose" version of the memo that could be distributed on a widespread basis, Geyer readily complied and quickly sent a version of the Bailey Opinion Memo that would accommodate Woodbridge's request.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

174.   Geyer's and Bailey's conduct was a substantial factor in causing harm to the investors.

175.   The investors were harmed by the fraudulent conduct of Woodbridge that Geyer and Bailey knowingly and substantially assisted.  As a direct and proximate result of such conduct, the investors have suffered damages in an amount to be proven at trial but believed to be in excess of $500 million.

176.   Geyer's and Bailey's actions were undertaken intentionally and in conscious disregard of Plaintiff's rights.  In addition, these acts were malicious, oppressive, and fraudulent.  Plaintiff should be awarded punitive damages sufficient to punish Geyer and Bailey and to deter similar conduct in the future.

## ELEVENTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Bailey, Geyer, and DOES 1-100)

177.   Plaintiff repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

178.   At all relevant times, Shapiro was the sole individual controlling Woodbridge and all of its funds.  Shapiro had complete control, and was the sole signatory, of all of Woodbridge's bank accounts.  By reason of his controlling positions, actions, and representations to the investors, and by reason of the investors having deposited funds into Shapiro's control with the understanding he would act in accordance with his promises in regard to the use of such funds, Shapiro owed investors fiduciary duties of loyalty and care and to deal honestly and in good faith.

179.   By selling the investors FPCM Notes and Unit Offerings pursuant to false offering materials and false FPCM documents; misappropriating, commingling, and otherwise misusing investor funds; and operating Woodbridge as a massive Ponzi scheme, Shapiro breached fiduciary duties owed to the investors.

180.   Geyer and Bailey substantially assisted Shapiro's breach of his

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  fiduciary duties by drafting the Bailey Opinion Memo, which asserted the false and

2  unreasonable conclusion that FPCM Notes are not securities under Ohio law.

3       181.   Geyer and Bailey knew that the Bailey Opinion Memo was false and

4  misleading and that Shapiro and Woodbridge planned to distribute the Bailey

5  Opinion Memo to the investors to induce them to purchase Woodbridge's securities.

6  Indeed, when Woodbridge requested that Geyer and Bailey prepare an "all purpose"

7  version of the memo that could be distributed on a widespread basis, Geyer readily

8  complied and quickly sent a version of the Bailey Opinion Memo that would

9  accommodate Woodbridge's request.

10      182.   Geyer and Bailey knew that Shapiro was breaching his fiduciary duties

11  to the investors by knowingly selling them unregistered securities in the form of

12  FPCM Notes, and by inducing them to invest through false and unreasonable

13  assurances that FPCMs are not securities.

14      183.   As a result of Shapiro's breaches of his fiduciary duties to the investors

15  that Geyer and Bailey knowingly and substantially assisted, the investors were

16  harmed in an amount to be determined at trial but believed to be in excess of $500

17  million.

18      184.   Geyer's and Bailey's actions were undertaken intentionally and in

19  conscious disregard of Plaintiff's rights.  In addition, these acts were malicious,

20  oppressive, and fraudulent.  Plaintiff should be awarded punitive damages sufficient

21  to punish Geyer and Bailey and to deter similar conduct in the future.

## TWELFTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against Bailey, Geyer, and DOES 1-100)

25      185.   Plaintiff repeats and realleges each and every foregoing and subsequent

26  allegation contained in the Complaint, and further alleges as follows:

27      186.   Geyer and Bailey substantially assisted the Woodbridge Ponzi scheme

28  by drafting the Bailey Opinion Memo, which contained the false and unreasonable

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

conclusion that FPCM Notes are not securities under Ohio securities laws.  Geyer and Bailey knew that this conclusion was false and misleading, or they had no reasonable grounds for believing such conclusion was true when they made it.

187.    Because Geyer and Bailey knew that the Bailey Opinion Memo would be circulated to and relied upon by investors, they owed the investors a duty of care to make sure that their representations were true, reasonable, and not misleading.

188.    Geyer's and Bailey's conduct in drafting the Bailey Opinion Memo fell below the applicable standard of care, as they failed to use the skill and care that a reasonably careful attorney would have used under similar circumstances.

189.    Investors reasonably relied on the false representations and assurances in the Bailey Opinion Memo when the investors purchased their investments in Woodbridge.  Had they known the true facts, they would have not purchased the securities.

190.    Geyer's and Bailey's negligent conduct was a substantial factor in causing the investors' harm.

191.    As a direct and proximate result of Geyer's and Bailey's negligent conduct described above, the investors were harmed in an amount to be determined at trial, but believed to be in excess of $500 million.

## THIRTEENTH CAUSE OF ACTION

### Professional Negligence

### (Against Bailey, Geyer, and DOES 1-100)

192.    Plaintiff repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

193.    Geyer and Bailey substantially assisted the Woodbridge Ponzi scheme by drafting the Bailey Opinion Memo, which contained the false and unreasonable conclusion that FPCM Notes are not securities under Ohio securities laws.  Geyer and Bailey knew that this conclusion was false and misleading, or they had no reasonable grounds for believing such conclusion was true when they made it.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

194.   Because Geyer and Bailey knew that the Bailey Opinion Memo would be circulated to and relied upon by investors, they owed the investors a duty of care to make sure that their representations were true, reasonable, and not misleading.

195.   Geyer's and Bailey's conduct in drafting the Bailey Opinion Memo fell below the applicable standard of care, as they failed to use the skill and care that a reasonably careful attorney would have used under similar circumstances.

196.   Investors reasonably relied on the false representations and assurances in the Bailey Opinion Memo when the investors purchased their investments in Woodbridge.  Had they known the true facts, they would have not purchased the securities.

197.   Geyer's and Bailey's negligent conduct was a substantial factor in causing the investors' harm.

198.   As a direct and proximate result of Geyer's and Bailey's negligent conduct described above, the investors were harmed in an amount to be determined at trial, but believed to be in excess of $500 million.

## FOURTEENTH CAUSE OF ACTION

### Aiding and Abetting Conversion

### (Against Bailey, Geyer, and DOES 1-100)

199.   Plaintiff repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

200.   Each investor provided an identifiable sum of money to Woodbridge.

201.   At all relevant times, these investors had a right to immediate possession of their property transferred to Woodbridge.

202.   At all relevant times, Shapiro was the sole individual controlling Woodbridge and all of its funds.  Shapiro had complete control, and was the sole signatory, of all of Woodbridge's bank accounts.

203.   Exercising such control and using his access to the property that the investors placed with Woodbridge, Shapiro interfered with the investors' right to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  immediate possession of their property by, among other things, misappropriating,

2  commingling, and otherwise misusing investor money for various improper and

3  illegal purposes.  As part of the Ponzi scheme, Shapiro converted investors' funds

4  provided to Woodbridge by, among other things:

5      a)    Funneling the investors' money into LLCs that were affiliated with and

6            controlled by Shapiro, thereby allowing Shapiro to "pocket" their

7            money with entities that he controlled;

8      b)    Using their money to pay Woodbridge's operating costs;

9      c)    Using their money to pay false "profits" and "interest" payments to

10            earlier investors;

11      d)    Misappropriating their money to sustain Shapiro's lavish personal

12            lifestyle, including using their funds to pay for his mansion and home

13            renovations, travel and charter planes, and luxury items such as exotic

14            cars, expensive and rare artwork, a personal wine collection, and

15            jewelry; and

16      e)    Misappropriating their money to pay Shapiro's personal income taxes.

17      204.   Shapiro's and Woodbridge's interference with the investors' right to

18  possession was knowing and intentional.

19      205.   Geyer and Bailey substantially assisted Shapiro's conversion by

20  drafting the Bailey Opinion Memo, which falsely and unreasonably asserted that

21  FPCM Notes are not securities under Ohio securities laws.  Geyer and Bailey knew

22  that this conclusion was false, misleading, and unreasonable, and knew the Bailey

23  Opinion Memo would be distributed to investors in connection with Woodbridge's

24  sale of securities.

25      206.   Geyer and Bailey knew that Shapiro was converting the investors'

26  property.

27      207.   As a proximate result of Woodbridge's conversion of their property

28  that Geyer and Bailey knowingly and substantially assisted, the investors have been

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  harmed in an amount to be determined at trial, but believed to be in excess of $500

2  million.

3      208.   Geyer's and Bailey's actions were undertaken intentionally and in

4  conscious disregard of the investors' rights.  In addition, these acts were malicious,

5  oppressive, and fraudulent.  Plaintiff should be awarded punitive damages sufficient

6  to punish Geyer and Bailey and to deter similar conduct in the future.

7                    **FIFTEENTH CAUSE OF ACTION**

8      **Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

9                    **(Against Acevedo and DOES 1-100)**

10     209.   Defendant Acevedo used the means or instrumentalities of interstate

11  commerce in connection with the sale of securities to employ a device, scheme, or

12  artifice to defraud, and to engage in acts, practices, or courses of business which

13  operated as a fraud or deceit upon Woodbridge's investors.

14     210.   Acevedo knowingly or recklessly distributed the false and misleading

15  Rome and Bailey Opinion Memos to prospective outside salespeople and

16  prospective investors.  Those prospective outside salespeople and investors relied on

17  the memos when they chose to do business with Woodbridge.

18     211.   Those prospective investors, financial planners and other outside sales

19  people who were not licensed to sell securities relied on the conclusion in the Rome

20  Opinion Memo that the FPCM Notes were not securities.  Had they known that the

21  FPCM Notes were in fact unregistered securities, they would not have bought or

22  sold them.

23     212.   These financial planners in turn sold the FPCM Notes to Woodbridge's

24  investors.  The investors suffered damage because they paid artificially inflated

25  prices for the FPCM Notes.  Had they known that the FPCM Notes were being sold

26  as part of a massive and unlawful unregistered securities scheme, they would have

27  not purchased them at the price they paid, if at all.

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendants and for relief as follows:

    a)    For general and consequential damages in excess of $500 million, or in an amount to be proven at trial;

    b)    For rescission and restitutionary damages;

    c)    For each of the remedies set forth in Civil Code § 3439.07, including, but not limited to, avoidance of all fraudulent transfers and a preliminary and permanent injunction against any further fraudulent transfers;

    d)    For punitive damages;

    e)    For legal costs and attorneys' fees;

    f)    For pre-judgment and post-judgment interest; and

    g)    For such other relief as the Court deems proper.

DATED:  October 28, 2020        MILLER BARONDESS, LLP

By:   /s/ Louis R. Miller
        LOUIS R. MILLER
        Attorneys for Plaintiff
        MICHAEL GOLDBERG AS TRUSTEE
        OF THE WOODBRIDGE
        LIQUIDATION TRUST

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial.

DATED:  October 28, 2020          MILLER BARONDESS, LLP


By:   /s/ Louis R. Miller
          LOUIS R. MILLER
          Attorneys for Plaintiff
          MICHAEL GOLDBERG AS TRUSTEE
          OF THE WOODBRIDGE
          LIQUIDATION TRUST

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## INDEX OF EXHIBITS

| Ex. No. | Description | Pg. No. |
|---------|-------------|---------|
| 1. | Schedule of Assignments | 51-143 |